IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Jose E. Muratti-Toro | CIVIL NO.: |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| Merck & Co., Inc.; ABC Insurance Co.; John Doe | |
| Defendant | |

## COMPLAINT

TO THE HONORABLE COURT:

Comes now the Plaintiff, through the undersigned attorneys and respectfully allege and request as follows:

### I.    NATURE OF THE ACTION

This is an action brought by the Plaintiff seeking compensatory relief and damages as a result of discriminatory and retaliatory treatment by his employer, Merck & Co., Inc. ("Merck"), as a result of his national origin, native Puerto Rican, his age, and as a result having exercised his rights guaranteed under Title VII and having opposed discrimination and retaliation. The Plaintiff is a United States citizen of Puerto Rican national origin and at all relevant times was an employee of Merck. Defendant's actions described herein were continuous, illegal, discriminatory, without justification, unreasonable, abusive, arbitrary, oppressive, intentional and an abuse of power by the Defendant acting under color of authority. In addition to discriminating against the Plaintiff due to his age and national origin, the Defendant had a pattern and practice of discrimination and retaliation. Defendants' actions and omissions disproportionately impacted Plaintiff on the basis of his national origin when he was given an inordinate amount of workload while not being proportionately compensated for the same, in comparison to his counterparts in the mainland, who were paid the same salary as the Plaintiff, or more, for a substantially less amount of work. As a result of Defendants' actions, the Plaintiff was illegally and unjustly terminated from his employment on October 5th, 2011. The Defendants and its supervisors have intentionally discriminated and retaliated against the Plaintiff and

deprived him of his employment without due process of law in violation of the Constitution and laws of the United States of America.  As a result, Defendant's illegal and intentional actions and omissions have caused Plaintiff's damages alleged in this Complaint.

## II.  JURISDICTION AND VENUE

2.1      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, Federal Question Jurisdiction, the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. §621-634; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e- et seq.; 5 U.S.C. §2302, and 29 C.F.R. §1614.407.

2.2      This Honorable Court also has jurisdiction over the captioned parties and the subject matter in this litigation since all parties on either side of the controversy are of diverse citizenship and the amount in controversy, exclusive of interest and costs exceeds SEVENTY FIVE THOUSAND DOLLARES ($75,000.00) in accordance with 28 USC 1332.

2.3      Venue is proper within this district as the actions and transactions complained of, occurred within the Commonwealth of Puerto Rico.

2.4      Pursuant to the Seventh Amendment of the United States Constitution, the Plaintiff demands a trial by jury in the instant case.

## III.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.1      The Plaintiff filed a formal complaint of discrimination and retaliation with the Equal Employment Opportunity Commission (hereinafter "EEOC") on December 20th, 2011.

3.2      Subsequently, on February 28th, 2012 the EEOC issued to Plaintiff a Notice of the Right to Sue.  Thus, the Plaintiff has complied with all statutory prerequisites for maintaining a civil action as set forth in the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. §621-634 and in Title VII of the Civil rights Act, 42 U.S.C. §2000e et seq. and 29 C.F.R. §1614.407.

## IV.      PARTIES

4.1      Plaintiff Jose E. Muratti-Toro, is of legal age, of Puerto Rican national origin and a United States citizen residing in the Commonwealth of Puerto Rico.

4.2     The Defendant Merck was, at all times relevant to this Complaint, Plaintiff's employer with its corporate headquarters in Whitehouse Station, New Jersey. Plaintiff's direct supervisors were also located in New Jersey.

4.3     Defendant ABC Insurance Co. is an unknown insurance company which had issued and in effect an insurance policy covering the liability of Merck & Co., Inc. for claims as the one alleged in this case.

4.4     John Doe is an unknown person, corporation, business, insurance company or legal entity which may also be responsible for the damages suffered by the plaintiff. All of these unknown defendants are, to our best knowledge and belief, citizens and residents of a State other than the Commonwealth of Puerto Rico.

V.     FACTS

5.1     Mr. José Muratti held the position of Communications and External Relations Manager in Merck, for the Merck Manufacturing Division in Puerto Rico, and was assigned to handle the communications of three separate Puerto Rico Merck sites: Barceloneta, Arecibo and Las Piedras. His supervisors worked directly from the New Jersey Merck offices and were non-Puerto Rican, as opposed to the vast majority of Merck employees assigned to work in Puerto Rico.

5.2     At the time of the events, Mr. Muratti had been working for Merck for more than six years during which he received numerous excellence awards for his performance, eight (8) of them during the year 2010 alone. In addition, during 2009 and 2010 his performance was rewarded with Company shares, and all of which should be reflected in his employee personnel file.

5.3     However, during 2010, Mr. Muratti's professional reputation, employment history and emotional health was adversely impacted by Ms. Constance (a.k.a. Connie) Wickersham (Communications MMD Global Communications at Merck for North America and Puerto Rico), whom the Company placed as his immediate supervisor in said year. She was based in New Jersey, spoke to him on a weekly basis to follow up on his duties and occasionally visited Puerto Rico to meet with him.

5.4     Ms. Wickersham, who was short-tempered and has a history of negative claims against her with the Company (all filed by subordinate employees in Merck), during the past year, and as a result of unsubstantiated

claims related to Muratti failing to meet conflicting requirements, increasingly began a harassing pattern which included screaming "I don't care about..." at Mr. Muratti over the phone and using demeaning and abrasive phrases, regarding any given issue being discussed at any moment.

5.5     Ms. Wickersham, well aware that Mr. Muratti is a native Puerto Rican, continuously mocked Mr. Muratti's voice and manner of speaking during their conversations whenever she was not in agreement with him, and immediately followed the mockery with negative comments about his performance, putting down his ideas, negatively comparing him to other employees with the same position, and generally disagreeing with his input of what was being discussed between them.

5.6     Communications and External Relations Managers throughout Merck typically have one or two sites to manage, while Mr. Muratti, in comparison, had been assigned an inordinate amount of workload as compared to his non-Puerto Rican counterparts in the mainland, having a total of three separate Puerto Rico Merck sites to handle its communications: Barceloneta, Arecibo and Las Piedras. In addition to the above, his counterparts in the mainland often have the benefit of support systems to produce internal and external communications, whereas Mr. Muratti did not and was still expected to produce the same amount, and often more, products than his counterparts.

5.7     In *addition to his regular duties*, Mr. Muratti was required to translate to the English language numerous communications originally prepared in Spanish, in order to obtain approval from Ms. Wickersham, as well as many received in English to share with the non-English speaking population. During the past year, Ms. Wickersham determined that Mr. Muratti was to prepare two to three additional articles every week to place in a global internal website. Mr. Muratti also had to prepare the articles, send them to be reviewed by Ms. Wickersham and then translate them back into Spanish because she had decided that this was to be a bilingual site. None of these additional duties were required from Mr. Muratti's counterparts in the mainland.

5.8     Despite the fact that Ms. Wickersham demanded that the articles were to inform the local Spanish-speaking employees, whenever Mr. Muratti prepared articles that were pertinent to the local (Puerto Rico) employees she

would say "So what? This is not something the mainland readers care about". Mr. Muratti's articles were constantly and unjustly rejected by Ms. Wickersham for being "badly written" and he was admonished for not sending revisions back for further scrutiny. Several times, after the revisions were done, Ms. Wickersham simply arbitrarily decided that they were not going to be published which resulted in long wasted hours that Mr. Muratti could have spent on his regular duties.

5.9     Needless to say, Mr. Muratti's translated communications were to be ultimately published in the Spanish language, given that they were destined for the Puerto Rico Merck employees. Mr. Muratti's non-Puerto Rican counterparts (including the Latin American emerging markets) did not have to translate their communications to their supervisors nor place them in Spanish and English or Portuguese and English. The task of translating each document significantly increased Mr. Muratti's duties and reduced the amount of time he had to perform the actual necessary functions of his position. This put Mr. Muratti at a disadvantage in terms of his deadlines and amount of workload when compared to his non-Puerto Rican counterparts, which also provoked negative comments from Ms. Wickersham regarding the time it took him to complete his tasks, even though she had personal knowledge of Mr. Muratti's situation.

5.10    In addition to all of the extra duties required from him described above, for three years Mr. Muratti was also in charge of preparing Vice President for Merck Manufacturing Operations in Puerto Rico, Daneris Fernández's, public speeches and presentations, as president of the Puerto Rico Pharmaceutical Industrial Association (PIA), a duty not required from Mr. Muratti's counterparts and which entailed working off the clock for him to be able to perform the traditional duties required of him in the position. Mr. Muratti also prepared an average of twelve speeches and as many presentations per year to diverse community organizations as part of his job, and the speeches and presentations of Ms. Fernández, including those required for PIA's Annual Convention, Board Meetings and addresses to the Governor of Puerto Rico and other stakeholders. In fact, some of the presentations prepared in English by Mr. Muratti for PIA are still being used by the current President of the Board.

5.11    As part of the harassing pattern towards Mr. Muratti, Ms. Wickersham continuously made derogatory remarks in a belittling tone, often using the term "down there" whenever she referred to the Puerto Rico Merck sites such as repeatedly stating "it is a mess down there", often making derogatory comments about Puerto Rico's manufacturing and commercial division's leadership, including referring to HR as "Inhuman Resources". Surely, one would not expect a communications supervisor professional to use discriminatory terms, more so when they are directed to an employee who is a native of and is located "down there".

5.12    Over and above Ms. Wickersham's unprofessional displays, and well aware that English was not Mr. Muratti's first language, she continuously criticized Mr. Muratti's translations and grammar stating at times that she was "appalled" by how poor Mr. Muratti's writing was.  She added that of all the managers that had attended the May 2011 Company workshop on writing skills, Mr. Muratti was the only one who had not shown any improvement and who had "gone backwards".  She also stated to him that his work was "substandard" and that he was "supposed to be a communications professional" implying that he wasn't competent for his position. As if this was not enough, Ms. Wickersham openly accused Mr. Muratti of plagiarism in one of her communications. However, with a simple review of Mr. Muratti's communications records, and even the letters submitted by him to Merck to address this situation, one must conclude that Mr. Muratti is, indeed, very capable, and does not lack English grammar or communications skills.

5.13    Additionally, on March 10, 2011 Ms. Wickersham issued a Performance Expectations Memo (hereinafter, "Memo") regarding Mr. Muratti's performance during the year 2010. Needless to say, Ms. Wickersham gave Mr. Muratti a contradictory and unusually poor performance review for someone who had been awarded with eight (8) excellence awards during the year relevant to the performance review and whose previous review (for the year 2009) had been excellent and was rewarded with company shares and the highest bonus allowed.  Said Memo also warned Mr. Muratti that he had until April 11th to demonstrate that he had improved on the performance areas included in the same.

5.14    Consequently, Mr. Muratti responded to the Memo (and copied the same to the Arecibo site Human Resources office). Said response consisted of twenty-seven (27) pages in which Mr. Muratti expressed, on the most cordial of tones, that the Memo had not been based on facts and proceeded to discuss in detail each item included in the same, accompanying it with supportive documents that demonstrated the complete opposite of what had been pointed out by Ms. Wickersham.

5.15    Instead of answering to Mr. Muratti's response and request for reconsideration of his performance review, Ms. Wickersham merely stated that his response had been added to his Human Resources (hereinafter, "HR") file. Therefore, the Company never addressed any of the concerns included in Mr. Muratti's response and completely ignored his request. What is more worrying is the fact that said Memo, which was supposed to be limited to Mr. Muratti's performance during 2010, included items relevant to events occurred in 2011. Ms. Wickersham as well as Merck ignored Mr. Muratti's arguments as to this particular matter.

5.16    Subsequently, Merck, through Ms. Wickersham, issued Mr. Muratti's annual 2010 evaluation. Surprisingly, it contained the same allegations included in the Performance Expectations Memo even though Mr. Muratti had objected to most of the items, accompanied the relevant documents that clearly contradicted Ms. Wickersham's comments and had thoroughly discussed each item. Again, Mr. Muratti responded with an extensive memo detailing the misinformation on which Ms. Wickersham's report was based upon, and included additional addenda. Yet again, Ms. Wickersham nor the Company responded and Mr. Muratti was instructed to sign the evaluation in spite his objection and disagreement. In addition, Mr. Muratti asked Ms. Wickersham for specific goals and expectations, which she expected him to comply with but, as before, never got an answer from her.

5.17    Mr. Muratti, frustrated with the ongoing situation with his supervisor, brought his concerns upon Mr. Juan J. Soltero, HR Manager at Merck in Barceloneta, who was very receptive and suggested two courses of action: the first was to file a claim against Ms. Wickersham in HR; the second was to try to demonstrate Ms. Wickersham that she was wrong in her perception of him. Mr. Muratti, in order to avoid further deterioration of his relationship with Ms. Wickersham, opted for the second of the options given by Mr. Soltero.

5.18    Sometime after, and noting that the situation was not improving with Ms. Wickersham, Mr. Muratti again brought his concerns to HR a second time, this time to Ms. Ivonne Pérez, HR Manager at Merck in Arecibo. Upon listening to Mr. Muratti's situation with his supervisor, Ms. Pérez advised him not to file a claim and continue to try demonstrating Ms. Wickersham that he was indeed doing his job. Mr. Muratti followed Ms. Pérez's advice and did not file a formal claim at that time.

5.19    Later, during May 2011, a writing conference for U.S. and Puerto Rico communications managers was scheduled by Global Communications in New Jersey. Mr. Muratti requested a meeting with Ms. Wickersham in order to try to clear the air and her expectations of him. Ms. Wickersham responded that she would meet with him only if her supervisor Ms. Kyra Lindenmann, Senior Director, MMD Global Communications at Merck (who used to be Mr. Muratti's previous supervisor) and Mr. John Bloomfield, Head of Global Communications for the Americas, were present. Not surprisingly though, Ms. Wickersham never scheduled the meeting.

5.20.    As a result of Merck's inaction, during his stay in New Jersey, Mr. Muratti asked to meet Ms. Lindemann and during said meeting he described how uncomfortable he felt with Ms. Wickersham's behavior. Ms. Lindemann stated that she would speak to Ms. Wickersham and asked Mr. Muratti if he had received notice of status of his performance Memo. Mr. Muratti then informed her that none of his communications regarding his Memo or Evaluation were addressed or responded to. After said meeting, Ms. Wickersham's behavior towards Mr. Muratti improved only for a couple of weeks but then took a turn for the worse which caused him to become deeply stressed, taking a toll on his emotional well being.

5.21    Such was the situation with Ms. Wickersham, that Mr. Muratti was forced to seek help from a psychiatrist on July 2011, as a result of the sequence of events described above.  Upon evaluating him, Mr. Muratti's doctor immediately ordered him a two-week sick leave from work due to the reason that he found the situation to severely affect Mr. Muratti's emotional stability. Mr. Muratti, making use of the proper channels, informed HR of his doctor's

order and requested the two-week sick leave ordered by his doctor, which was authorized by said HR and Merck Health Services offices.[1] Mr. Muratti then immediately notified Ms. Wickersham of the authorized sick leave.

5.22    Upon returning from his sick leave, Mr. Muratti received a warning letter from Ms. Wickersham, dated August 15, 2011 and titled "Disregard of Corporate Policy – Warning Letter". In it, Ms. Wickersham pointed out Mr. Muratti's failure to follow the procedures outlined in Corporate Policy No. 79. Consequently, Mr. Muratti then raised his concerns to Mr. Anton Roure, Sub-Region HR Leader at Merck for Puerto Rico and Latin America, regarding the issuance of this warning letter since he had previously sought authorization from HR prior to taking sick leave.

5.23    Subsequently, Ms. Wickersham was forced to rescind from her warning letter issued but, amazingly, still accused Mr. Muratti of "assuming" that he "was acting in a manner which he believed was consistent with local practice". In her Notice of Rescission, dated September 23, 2011 Ms. Wickersham went as far as to also accuse Mr. Muratti of risking "causing serious disruption to the organization's ability to meet the needs of the clients" and requested him to provide a longer time's notice to the company next time he was thinking of taking sick leave, absent extenuating circumstances. Merck allowed this Notice of Rescission to be issued even though it had a copy of Mr. Muratti's doctor's order in its HR and Health Services offices, which confirmed the extenuating circumstances required, given that the order was effective immediately.

5.24    During September 2011, Mr. Muratti again brought all of the above described events and concerns to HR Director Anton Roure, after observing that each time Ms. Wickersham received instructions to change her attitude towards Mr. Muratti, she would act courteously for a couple of weeks and then return with the same abrasive attitude. Mr. Roure, after reading an extensive letter detailing much of the events occurred between Mr. Muratti and Ms. Wickersham and which alleged discriminatory animus against Merck, proceeded to seek internal remedy following Merck procedures for this type of complaints from employees regarding mistreatment by supervisors and in

---

[1] Mr. Muratti rarely ever took sick leave (with the exception of the two-week period ordered by his doctor and described above) and vacation leave only as approved by the Company. At the time of his termination, Mr. Muratti had a balance of thirteen (13) vacation days and an accumulated balance of 72 days of sick leave.

alignment with recently reviewed Code of Conduct guidelines which, ironically, Mr. Muratti had been in charge of disseminating to the general Merck employee population in Puerto Rico.

5.25    Mr. Muratti was terminated a few weeks later on October 5th, 2011, due to an alleged "reduction in force or corporate restructuring" (Merck did not specify which of the two) and offered a Severance Package, which he refused given the unjust circumstances he was subjected to and the unacceptable terms of Merck's offer.

5.26    Throughout his employment with Merck, Mr. Muratti has written speeches, presentations and articles for Ms. Daneris Fernández (VP Merck Puerto Rico Operations), Ms. Ruth Cortés (Director Shared Services Merck Puerto Rico Operations), Mr. Herminio Bosques (Director Procurement Merck Puerto Rico Operations) and Mr. Anton Roure, both in English and Spanish, whose expectations he met and, on many occasions, he was informed that he exceeded the same. Mr. Muratti prepared employees for their questions and answers (Q & As) sessions with corporate officials such as the President of Merck, Mr. Dick Clark, the new President, Mr. Kenneth Frazier and the Manufacturing Division President Mr. Willie Deese, as well as scores of global leaders who participated in Puerto Rico based activities.

5.27    Mr. Muratti also represented Merck and coordinated high-level events with mainland and local university presidents and faculty, international speakers such as a former President of the U.S. Nuclear Commission and Spain's main alternate energy company CENER, legislators, the U.S. Environmental Protection Agency and Food and Drug Administration Directors, Secretaries of Education and Economic Development, Puerto Rico Industrial Development Corporation (PRIDCO) officials, Pharmaceutical Industrial Association (PIA), PR Manufacturers Association, and Pharmaceutical Research & Manufacturers Association of America (PhRMA) Board Presidents and Executive Committees, as well as the Puerto Rico Chamber of Commerce and the Puerto Rico Industry University Research Consortium, among others.

5.28    Mr. Muratti also coordinated several Corporate Responsibility education, environmental and community activities for which he achieved ample media coverage, as well as activities for Merck employees, college and high

school students and municipal officials. All of the above were conducted with decorum and professionalism, given Mr. Muratti's high standing in the community having been a member of the Board of Directors of the PR Manufacturers Association and having worked closely with the Council on Higher Education and the three major university systems in Puerto Rico. Said activities' outcomes also resulted on congratulatory expressions and excellence awards directed to Mr. Muratti from Merck and external associations' top management. Mr. Muratti clearly demonstrated to Merck and other peers in his industry that he is, in fact, a communications professional, contrary to his supervisor's comments and expressions to the contrary.

5.29    Throughout his six years of employment with Merck, and before Ms. Wickersham entered the picture, Mr. Muratti had been supervised by three U.S. colleagues, two of which Ms. Wickersham reports to, and four Puerto Rico staff. These colleagues always showed Mr. Muratti respect and deference for his professionalism and performance. Even before his employment with Merck, which includes careers in New York as well as in Puerto Rico, Mr. Muratti had never been discriminated, been yelled at, mocked, or been told that his work was "appalling", nor accused of being unprofessional.

5.30    Curiously, and according to Mr. Muratti's Severance Package enclosures, which consists of employee lists affected and unaffected by a "reduction in force", in accordance to the Older Workers' Benefit Protection Act of 1990, Mr. Muratti was the only person terminated from his employment out of 820 employees in Puerto Rico. Furthermore, he was one of the three oldest employees working for Merck in said location; the remaining two were assigned to Mechanic and Human Resources positions.

5.31    Mr. Muratti's duties necessarily have to be performed in Merck and what is more, due to the location where Mr. Muratti was assigned to (a total of three sites in Puerto Rico), Merck will unavoidably have to assign Mr. Muratti's previous duties to another employee in the same locations, since his superiors in the mainland have little or no knowledge of local affairs or Spanish, which is essential to the position allegedly removed. Moreover, due to the fact that there are almost no employees over sixty years old, the Company will inescapably have to assign Mr. Muratti's

duties to a younger peer or outsource said services, which costs would ultimately defeat the purposes of Mr. Muratti's employment termination.

5.32    As one can observe, Merck continuously displayed a pattern and practice (as far as Mr. Muratti was concerned) of ignoring his letters and claims. None of Mr. Muratti's communications and verbal requests, destined to address the unprofessional, discriminatory and harassing behavior displayed by his supervisor, were ever answered by the Company.  Similarly, none of his communications and verbal requests seeking to address the "issues" raised by Ms. Wickersham with regards to Mr. Muratti's performance evaluation were ever answered by the Company.  In addition, Merck discouraged Mr. Muratti from filing a formal complaint in the company against his supervisor, amid a serious and troublesome situation concerning a supervisor/subordinate relationship.

5.33    In addition to ignoring his letters and claims, Merck never took any corrective actions and/or measures to guarantee Mr. Muratti's right to a discriminatory and hostile free work environment, constituting a reckless disregard for an employee who was only seeking help to address the situation described above.

5.34    In the almost seven years that Mr. Muratti worked for the Company, he had never received negative performance reviews or had any problems with regards to his employment or performance before 2011. As a result, the events timeline reflect a very busy nitpicking period against Mr. Muratti only months prior to his termination.

5.35    In addition to the above, and according to the KRONOS timekeeping system, throughout his employment with Merck, Mr. Muratti averaged from 180 to 190 hours of work per month, about 20 to 30 hours above the typical Merck employee and the equivalent of an additional week's worth of work. This is compatible with the unequally large amount of workload required from him, in comparison with his counterparts in the mainland.

5.36    At the present day, Mr. Muratti is 61 years old, which makes it harder for him to attract new job offers and employers, considering the number of years left for his retirement. Furthermore, Mr. Muratti was terminated from his employment a mere four (4) years before his retirement age of 65 years old, depriving him from the Merck's retirement plan, which he had counted on receiving.

5.37    As previously stated, Mr. Muratti has been receiving psychiatric treatment since July of 2011 for the severe depression, anxiety and lack of sleep he suffered as a result of the work environment he was put through. His daily life was also affected because of the mistreatments suffered, and now has to endure psychiatric treatment, which he never before had to.   Among the damages for which Mr. Muratti is entitled to the remedies provided by the law are loss of enjoyment of life, emotional distress, mental anguish, pain, suffering and inconvenience.

5.38    In conclusion, taking all of the above events collectively, one must conclude that the expressed reason for Mr. Muratti's termination (a supposed reorganization or reduction in force) is a mere pretext, when the real reason is the discrimination and retaliation to which he was submitted.

## VI.    FIRST CAUSE OF ACTION

6.1    The preceding paragraphs are reaffirmed and re-alleged herein.

6.2    The Defendants' actions and omissions have been taken under the color of authority.  Such actions are illegal, unlawful, willful, intentional and constitute a violation of laws and constitution of the United States of America, including, but not limited to Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16; 5 U.S.C. §2302(b)(1)(a); 29 C.F.R. part 1614.101(a).  These actions and omissions were intentional and taken with complete disregard and reckless indifference to Plaintiff's rights. The actions were continuous and were part of a policy and a pattern and practice of discrimination and retaliation against a native Puerto Rican, 60 year-old employee who had exercised his civil rights and had engaged in protected activity.

6.3    Defendants' actions and omissions disproportionately impacted Plaintiff on the basis of his national origin when he was given an inordinate amount of workload while not being proportionately compensated for the same, in comparison to his counterparts in the mainland, who were paid the same salary as the Plaintiff, or more, for a substantially less amount of work.

6.4    The Defendants' conduct complained of herein has caused and continues to cause significant emotional harm and damages entitling Plaintiffs to compensatory damages.

6.5     Plaintiff's national origin, native Puerto Rican, was a motivating factor in Defendants' discrimination which later resulted in retaliation.

6.6     The *unlawful discrimination* on the basis of national origin, unequal treatment, oppressive acts and omissions engaged in by Defendants as set forth herein have caused, and are causing and will continue causing injuries and damages to the Plaintiff.  All of aforementioned acts violate the rights guaranteed to the Plaintiff under the Constitution and laws of the United States of America.   As such, Defendants are responsible to the Plaintiff for back pay, future pay, loss of leave, overtime, medical expenses and other benefits lost.

6.7     Due to the fact that Defendants engaged in intentional discrimination against the Plaintiff, and did so with malice or reckless indifference to his federally protected rights of an aggrieved individual, he is entitled to an award for punitive damages.

6.8     The loss of income, past, present and future is estimated at no less than $500,000.00.

6.9     The compensatory and punitive damages are estimated at no less than $1,300,000.00.

## VII.     SECOND CAUSE OF ACTION

7.1     The preceding paragraphs are reaffirmed and re-alleged herein.

7.2     The Defendants' *retaliatory actions and omissions* as described above were illegal, unlawful, willful, intentional and constitute a violation of the laws and Constitution of the United States of America, including, but not limited to Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16, 5 U.S.C. §2302(b)(1)(a); 29 C.F.R. part 1614.101(a). These actions and omissions were intentional and taken with complete disregard and reckless indifference to Plaintiff's rights.

7.3     The compensatory damages under this cause of action are estimated at no less than $300,000.00.

## VIII.     THIRD CAUSE OF ACTION

8.1     The preceding paragraphs are reaffirmed and re-alleged herein.

8.2     The Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621 et seq., prohibits employment discrimination against persons forty (40) years of age or older, including the discharge of any individual because of

such individual's age. Mr. Muratti is an individual protected by the ADEA and, as such, is entitled to receive compensation for his illegal, discriminatory and unjustified discharge.

8.3     The Defendant's willful violation of the act, with reckless disregard and knowledge that this conduct was in violation of ADEA, gives rise to liquidated back pay, front pay and lost pension benefits.  The damages suffered by Plaintiff for the termination of his employment and back pay are estimated in $500,000.00.

## IX.     FOURTH CAUSE OF ACTION

### (Puerto Rico Labor Law 80)

9.1     The allegations contained in all preceding paragraphs are re-alleged as if fully alleged herein.

9.2     The actions taken by Defendants are in violation of 29 L.P.R.A. sec. 185 (Law 80- Just Cause), related to wrongful termination of employment and is entitled to the compensation established therein.

## X.     RELIEF

WHEREFORE, the Plaintiff respectfully requests that the Court:

(a)     Enter a Declaratory Judgment that the acts complained of herein are in violation of Title VII of the Civil Right Act, 42 U.S.C. §2000e, 5 U.S.C. §2302, and 29 C.F.R. §1614.407 as well as the Constitution of the United States, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621 et seq. and the Puerto Rico Labor Law 80, 29 L.P.R.A. sec. 185, for just cause.

(b)     Award the Plaintiff compensatory and punitive damages caused as a result of illegal acts in an amount of no less than $1,300,000.00 for each cause of action.

(c)     Award the Plaintiff all costs, expenses, and attorneys' fees.

(d)     Award the Plaintiff pre-judgment and post-judgment interest.

(e)     Award the Plaintiff back pay, future pay, loss of leave, overtime, medical expenses and other benefits lost in an amount of no less than $500,000.00 for each cause of action.

(f)     Retain jurisdiction over this action in order to assure full compliance with the decree in the event that the Court finds that the acts complained of herein were illegal and/or unconstitutional.

(g)     Grant the Plaintiff such other and further relief, as the court may deem appropriate and proper.

**CERTIFICATE OF SERVICE:** It is hereby certified that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record which are CM/ECF system participants at their corresponding e-mail addresses and which, pursuant to Local Civil Rule 5.1(b)(2), constitutes the equivalent service.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico March 12th, 2011

ÁLVARO R. CALDERÓN, JR., L.L.P. LAW OFFICES
PO BOX 192259
SAN JUAN, PR 00919-2259
TEL. 787 753-5050
FAX: 787 765-8028
EMAIL: arc@microjuris.com

s/ ÁLVARO R. CALDERÓN, JR.
**ÁLVARO R. CALDERÓN, JR.**
**(USDC 108304)**

s/ MÓNICA A. SÁNCHEZ RIVERA
**MÓNICA A. SÁNCHEZ RIVERA**
**(USDC 225403)**